**FILED**
**CLERK**

7/22/2026 4:22 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
ARIZONA BEVERAGES USA LLC.,

                      Plaintiff,

          - against -

ARDAGH METAL PACKAGING USA CORP.,

                      Defendant.
-------------------------------------------------------------------X

**MEMORANDUM**
**AND ORDER**

Civil Action
No. 25-4525 (GRB)(ARL)

**GARY R. BROWN, United States District Judge**:

This case concerns a contractual dispute between plaintiff AriZona Beverages USA, LLC ("AriZona") and Ardagh Metal Packaging USA Corp. ("Ardagh"). AriZona contends that the parties entered into a three-year supply contract, under which Ardagh was to supply AriZona with its trademark 24 ounce "big cans." However, AriZona claims that Ardagh repudiated the agreement and attempted to leverage AriZona for a higher price per can than the contract provided. Ardagh responds that there was no agreement between the parties and, even if there was such an agreement, it is unenforceable under the statute of frauds.

Presently before the Court is Ardagh's motion for judgment on the pleadings. Docket Entry ("DE") 46 ("Mot."). For the reasons that follow, that motion is granted in part and denied in part.

1

**Factual Background**

As alleged in the Complaint, AriZona is a major producer and distributor of iced tea, juice cocktails, and other products.  DE 17 (Arizona's Am. Compl. ("Compl.")) ¶ 1. The company is best known for 24 ounce "big can" drinks, which are often pre-priced to retail at 99 cents, much less than competitor products.  *Id*. ¶ 2.  That pricing has held constant since 1998 and has generated substantial goodwill for the brand, which AriZona asserts is especially important to its business model because the company does not advertise by print or on television.  *Id*. ¶¶ 3–4.



THE BIG CAN
THAT CHANGED
THE GAME.

Compl. ¶ 3 (AriZona logo and depiction of Big Can)

That is where Ardagh enters the picture.  Ardagh is one of the few manufacturers of big cans in the United States, a capacity it developed when AriZona's previous supplier, Ball Corporation ("Ball"), merged with its competitor Rexam Beverage Can Company ("Rexam") and divested to Ardagh several can manufacturing facilities in order to clear the merger with the FTC.  Compl. ¶¶ 25, 28–30, 35.  Ardagh also hired several former Rexam employees, who had pre-existing relationships with AriZona executives.  *Id*. ¶¶ 33–34, 37.  One such employee was Robert Sladewski, who became Ardagh's Chief Commercial Officer.  *Id*.  After AriZona and Ball's business

2

relationship deteriorated due to a dispute regarding Ball's failure to meet AriZona's can requirements (from which AriZona received a large arbitration award in 2022), AriZona turned to Ardagh as a new supplier.  *Id.* ¶¶ 32, 35.

AriZona initially purchased cans from Ardagh on an *ad hoc*, "spot" basis, but in 2024, the parties sought a longer-term agreement, eventually negotiating the parameters of a three-year agreement.  Compl. ¶ 35–36.  Between June and August 2024, Mr. Sladewski negotiated with AriZona's Vice Chairman David Menashi and other AriZona executives, during which time Mr. Sladewski made a long-term proposal that AriZona considered too expensive.  *Id.* ¶¶ 35, 37.  That September, Ardagh allegedly indicated that it would accept a lower price point, and between September and October 2024, the parties then negotiated both by email and by phone price adjustment formulas that were to incorporate inflationary and metal market factors to accommodate both parties. *Id.* ¶¶ 38–45.  On October 16th, Mr. Menashi emailed Mr. Sladewski that: "The following is our agreement for 24 oz can supply" and included a comprehensive list of terms including duration, a total forecasted volume of 200 to 325 million units annually with "no minimum requirement," and a complicated metal pricing methodology.  DE 50, Ex. B; Compl. ¶¶ 46, 48.  Mr. Sladewski responded:

> Thanks David.
>
> A few clarifications that I highlighted below including adding a release on the alleged freight issue.
>
> You note that there is no minimum volume. While there isn't a minimum annual volume, aren't we still talking about 100% of your SE requirements(although no volume specified for this geography)?

> On orders being satisfied in accordance with the required schedule, have no issues with this concept however lead times need to be reasonable.
>
> Will work with Pat to finalize the inflationary and metal adjustment mechanisms. Thx

DE 50, Ex. B; Compl. ¶ 47. (hereinafter, the "October 16th emails").

Following the October 16th emails, the parties continued to discuss the outstanding terms by phone, and allegedly agreed on several outstanding issues, which Mr. Menashi then memorialized in an email on October 18th (the "October 18th email").

Compl. ¶¶ 49–53. In that email, Mr. Menashi wrote:

> Hi Bob,
>
> I have updated my email to you of October 16 in order to reflect our conversation of today.
>
> The orange items are for you and Pat to complete.
>
> The green items are changes or additions to which we agreed.
>
> Please call me upon receipt.

DE 50, Ex. C. The October 18th email included a marked-up version of Mr. Menashi's October 16th email, as follows:[1]

> Hi Bob,
>
> The following is our agreement for 24 oz can supply:
>
> Term:                  now to 12/31/2027
>
> Forecasted volume/year in millions of units (*no take or pay*):
>
>> Your Winston-Salem, N. Carolina plant: 150 to 175
>>
>> Your Chicago plant:                              50 to 150

---

[1] Bold text reflects text highlighted in green. Italicized text indicates text highlighted in orange.

Inflation factors:    to be applied for purchases commencing 1/1/2026 (*note to Bob: consider which year to apply*)

Calculation TBD as between you and [AriZona finance VP] *Pat Catalina*, **including as to which indices to use**

**Calculation parameters discussed are: 25% Ardagh Profit Margin**

**65% pass-through to Az**

**1 year holiday**

Metal pricing:    M-1 methodology, as you and *Pat Catalina* agree, metal lock permitted

Pricing (at LME

and MWP of S1.20):    All calculations are performed from the date of the first purchase and over the following 12 months (FOB plant):

Initial invoice for bodies/thousand units (epoxy coating): $117.00/000

Upon cumulative purchases from both plants add up to 75 million units, with at least 80% of purchases being from Winston, invoice price for bodies drops to $115.80/000

AND a rebate of $1.20/000 is paid for all prior purchases from can one

AND the 80% requirement is dropped once the purchases from Winston add up to 150 million units

Upon cumulative purchases from both plants add up to 140 million units, with at least 80% of purchases being from Winston, invoice price for bodies drops to $115.30/000

AND an additional rebate of $0.50/000 is paid for all prior purchases from can one

5

> AND the 80% requirement is dropped once the purchases from Winston add up to 150 million units

Upon cumulative purchases from both plants add up to 150 million units, with at least 80% of purchases being from Winston, invoice price for bodies drops to $114.80/000

> AND an additional rebate of $0.50/000 is paid for all prior purchases from can one

> AND the 80% requirement is dropped once the purchases from Winston add up to 150 million units

Rebates are cumulative

BPANI coating upcharge, if required, is $0.50/000

Invoice for lids/thousand units (epoxy coating): $25.35

BPANI coating upcharge, if required, is $0.50/000

A 5% discrepancy is permitted between can and body purchases

All artwork and plate changes are included in pricing

Ardagh to supply technical assistance at co-packers as needed

Payment terms:      net 30

Ardagh will ensure that all orders are satisfied in accordance with the required schedules, absent a declared force majeure, **so long as lead times are reasonable**

**If Ardagh is unable to satisfy an order and Az satisfies that order from another supplier, the number of cans so supplied will count towards the can count differential from the relevant Ardagh plant** (*Bob: what if there is a freight differential?*)

6

**Az will release Ardagh from the 2022/_____ freight claim.**

DE 50, Ex. C; Compl. ¶ 54.

AriZona calls attention to several features of the email.  First, that AriZona's "release" of the "2022 [ ] freight claim" references a dispute over $5 million in allegedly overcharged freight.  Compl. ¶¶ 55–56.  Second, that the inflationary pricing would allegedly only make sense on a multi-year contract because the figure could only be calculated after a year.  *Id.* ¶¶ 57–58.  Third, that the reference to a "1 year holiday" to exempt one year of the deal from inflationary pricing would similarly be curious in a single year agreement.  *Id.*  The parties also seem to agree that the "no take or pay" term means there was no minimum volume.  Mot. at 10; DE 50 (AriZona's Response Br. ("Opp.") at 10–11.  In any event, the parties agree that Mr. Sladewski never responded to the October 18th email.  Compl. ¶ 59; Mot. at 4.

The parties later began separate discussions for Ardagh to supply AriZona with smaller "sleek cans," during which Mr. Sladewski referred to a pricing structure that would "utilize[ ] the same methodology as agreed on 24 oz." big cans.  DE 50, Ex. D.  At one point during the negotiations, another Ardagh representative referred to a "New Agreement" that was to be "effective December 2024."  DE 50, Ex. F; Compl. ¶¶ 63–68.

AriZona also claims that Ardagh produced, and AriZona purchased, cans at rates in conformance with the alleged agreement, further asserting that Ardagh performed complicated pricing adjustments in conformance with the pricing structure laid out in the October 18th email that would be inconsistent with a spot-buy structure.  Opp. at 14.  The Complaint describes the pricing reconciliation process as:

7

Ardagh would use a metal adjustment that was based on the average of the metal prices during a three month period. On a quarterly basis, however, the Parties would perform a "reconciliation" pursuant to which prices for the three months of the preceding quarter would be reconciled back to a traditional "M-1" methodology (i.e., the price for one month prior to the month of the invoice). Depending on the outcome of that reconciliation, AriZona would either owe an additional payment to Ardagh or be entitled to a refund from Ardagh.

Compl. ¶ 69. And AriZona alleges that the parties performed in conformance with that process over the succeeding months. *Id.* ¶¶ 70–76. Specifically, AriZona alleges that from October 2024 to June 2025:

Ardagh proceeded exactly as one would expect an aluminum can supplier that had entered into a Can Supply Agreement with AriZona to proceed: it performed that agreement. Throughout this period, Ardagh: (a) manufactured the cans ordered; (b) affixed AriZona's trademarks graphics and logos to those cans; (c) invoiced AriZona for the cans; (d) shipped the cans to AriZona's co-packers; (e) quoted prices computed in accordance with the agreement; (f) accepted payment from AriZona; and (g) performed contractually-required quarterly metal reconciliations, all in accordance with the terms agreed to in the Can Supply Agreement, including the PPI adjustment and metal reconciliation.

*Id.* ¶ 76. In total, Ardagh "manufactured and supplied over 112 million cans and 66 million ends/lids to AriZona and its co-packers, in over 1,162 separate shipments, and invoiced AriZona and was paid and accepted over $15 million." *Id.* ¶ 78.

In June 2025, however, Ardagh allegedly repudiated the agreement and sought a higher price-point per can. On June 24th, Mr. Sladewski sent an email to AriZona stating that "that negotiations were ongoing and that we needed to reach agreement on a number of key terms including: inflationary mechanism, metal adjustment and freight reconciliation," and Mr. Sladewski argued that the performance during 2025 could be

8

referenced to an agreement for a "spot buy."  Compl. ¶¶ 84–86.  AriZona rejected the repudiation of the alleged agreement the next day, and Mr. Sladewski responded by email that he would send "a draft to you in the next few days outlining the commercial terms that we'd be agreeable to moving forward with for continuing supply to AZ beyond July 30, 2025."  *Id*. ¶ 93.  The email ultimately proposed a 25% to 30% increase in can pricing over the alleged 2024 agreement.  *Id*. ¶ 94.  Despite those communications, AriZona alleges that a different Ardagh representative emailed AriZona on July 8th to discuss the price reconciliation process outlined above for the Second Quarter of 2025, which would not make sense if no agreement existed and the parties were instead operating on a spot-buy basis.  DE 50, Ex. J; Compl. ¶¶ 96–97.

The parties then attempted to negotiate a resolution to the dispute, but the discussions were unsuccessful.  Compl. ¶¶ 99–109, 123–124.  This litigation followed.

**Standard of Review**

"In deciding a Rule 12(c) motion, we employ the same standard applicable to dismissals pursuant to Rule 12(b)(6)."  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011) (alterations omitted).  A Rule 12(b)(6) motion would, in turn, pose the question of whether, assuming the allegations of the complaint to be true solely for the purposes of the motion, the Complaint sets forth factual material to render the claims plausible.  *Burris v. Nassau Cnty. Dist. Att'y*, No. 14-CV-5540 (JFB) (GRB), 2017 WL 9485714 at *3–4 (E.D.N.Y. Jan. 12, 2017), *adopted by* 2017 WL 1187709 (E.D.N.Y. Mar. 29, 2017).  Accordingly, courts adjudicating motions under Rule 12(c) "accept all factual

9

allegations in the complaint as true and draw all reasonable inferences in [the plaintiff's] favor." *L-7 Designs, Inc.*, 647 F.3d at 429.

**Legal Analysis**

The alleged contract between the parties concerns the purchase of beverage cans, a type of goods. Therefore, the contract is governed by Article 2 of New York's Uniform Commercial Code. *See Vista Food Exch., Inc. v. Comercial De Alimentos Sanchez S De R L De C.V.*, 147 F.4th 73, 89 (2d Cir. 2025). New York has recently amended its U.C.C. (effective June 2026), but "[t]he general rule, . . . is that contracts are interpreted in accordance with the law in effect at the time of their formation." *Maryland Cas. Co. v. Cont'l Cas. Co.*, 332 F.3d 145, 159 (2d Cir. 2003) (citing *Bloomfield v. Bloomfield*, 97 N.Y.2d 188, 194 (2001)). Therefore, the 2025 version of the U.C.C. governs this case.

### I.    Statute of Frauds

Ardagh first contends that regardless of whether the Complaint plausibly alleges an agreement between the parties, the statute of frauds would bar enforcement. Because Article 2 of the U.C.C. governs the instant dispute, the relevant statutory provision is N.Y. U.C.C. § 2-201.[2] Subsection (1) of that provision, as operative in 2025, states:

---

[2] Counsel for Ardagh suggests that both § 2–201 of the N.Y. U.C.C. and the general statute of limitations expressed in N.Y. G.O.L. § 5–701 apply to the alleged contract here. *See* Mot. at 17. However, "where the provisions of the U.C.C. and the G.O.L. conflict, a specific provision of the Statute of Frauds such as Uniform Commercial Code § 2–201 prevails over a general one such as General Obligations Law § 5–701." *E. Mishan & Sons, Inc. v. Homeland Housewares, LLC*, No. 10-CV-4931 (DAB), 2012 WL 2952901, at *4 (S.D.N.Y. July 16, 2012). Ardagh's primary contention under N.Y. G.O.L. § 5–701 that the

> Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

The default rule under the U.C.C. is therefore that the party against whom enforcement of an agreement is sought must have signed a writing evidencing the agreement. However, the writing "need not be incorporated in a single document but may be pieced together from several documents which relate to each other." *Reforestacion Cafetalera Agro-Indus. S.A. v. Campesino Food Corp.*, No. 97-CV-5553 (RCC), 1999 WL 4964, at *2 (S.D.N.Y. Jan. 6, 1999) (quoting *Weitnauer Trading Co. Ltd. v. Annis*, 516 F.2d 878, 880 (2d Cir. 1975)). And application of that rule is not meant to be formulistic. *See Vinifera Imports Ltd. v. Societa Agricola Castello Romitorio SRL*, No. 16–CV–00103 (ADS)(ARL), 2020 WL 1184962, at *8 (E.D.N.Y. Mar. 12, 2020) ("the Statute of Frauds protects unwitting parties from certain transactions particularly susceptible to fraud. It is not designed to permit parties to escape agreements they knowingly entered into through gamesmanship and mere technicalities.") (internal citations omitted). To the

---

writing does not "contain expressly or by reasonable implication all the material terms of the agreement" is expressly contradicted by New York law because "a contractual writing covering the sale of goods which is sufficient for enforceability under U.C.C. [§] 2–201 is valid despite its insufficiency under General Obligations Law § 5–701." *AP Propane, Inc. v. Sperbeck*, 555 N.Y.S.2d 211, 213 (3d Dep't 1990), *aff'd*, 77 N.Y.2d 886 (1991). Furthermore, Ardagh appears to have substantively abandoned the G.O.L. argument on reply. Therefore, the Court evaluates the substance of the statute of frauds defense only under the U.C.C.

contrary, the statute "simply requir[es] 'that the writing afford a basis for believing that the offered oral evidence rests on a real transaction.'"  *Bazak Int'l Corp. v. Mast Indus., Inc.*, 73 N.Y.2d 113, 120 (1989) (quoting U.C.C. § 2-201 official cmt. 1).

Ardagh submits that there is no writing endorsed by an Ardagh representative that would satisfy the statute of frauds, noting that the October 16th and 18th emails were both sent by AriZona representatives and therefore cannot bind Ardagh under any construction of subsection (1).  Even assuming the October 16th and October 18th emails are the universe of expressions of the parties' alleged agreement, however, the October 18 email qualifies as a merchant's confirmatory memorandum under the U.C.C.

The confirmatory memorandum exception to the statute of frauds, codified in New York's U.C.C. at § 2–201(2), provides:

> Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten days after it is received.

"There are no rigid requirements as to the form or content of a confirmatory writing.  A writing is sufficient so long as it affords a basis for believing that it reflects a real transaction between the parties."  *Hilord Chem. Corp. v. Ricoh Elecs., Inc.*, 875 F.2d 32, 37 (2d Cir. 1989); *see also Apex Oil Co. v. Vanguard Oil & Serv. Co. Inc.*, 760 F.2d 417, 423 (2d Cir. 1985) (finding confirmatory memorandum requirements satisfied even where a "telex did not in terms state that [defendant] was under an unconditional obligation to sell" because "all that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction," and the evidence "provided a basis for

12

the District Court to accept the testimony of [plaintiff's] witnesses concerning the nature of th[e] contract.") (cleaned up).  Here, the October 18th email references a conversation between Mr. Sladewski and Mr. Menashi that resulted in a purported agreement memorialized in the October 18th email.  That posture is sufficient for the confirmatory memorandum rule to be invoked, subject to its specific requirements.

As for those requirements, it is uncontested that both AriZona and Ardagh are merchants, and it is similarly uncontested that Ardagh never replied to the October 18th email.  *See* Mot. at 4 ("Mr. Sladewski never responded to Mr. Menashi's October 18 email, and AriZona makes no effort to plead he did.").  Therefore, the live issue for statute of frauds purposes is whether the October 18th email is "sufficient against" AriZona.  If so, the question becomes whether the expressions in the email plausibly detail the terms of the alleged contract.

"Sufficient against" in subsection (2) carries the same meaning as "signed" in subsection (1) because "writings [a]re not sufficient against the sender [if] they [a]re not signed by the sender.  *Smith Packing Co. v. Quality Pork Int'l, Inc.*, 561 N.Y.S.2d 970, 971 (4th Dep't 1990).  The U.C.C. definitions section, in turn, states that "signed" includes

13

"using any symbol executed or adopted with present intention to adopt or accept a writing." N.Y. U.C.C. § 1-201(37).[3]

To authenticate the confirmatory memorandum, the "signature" may be provided electronically, and "[a]n e-mail suffices as much as a letter, a telegram or a fax to provide such objective indication of an existing agreement." *Bazak Int'l Corp. v. Tarrant Apparel Grp.*, 378 F. Supp. 2d 377, 384 (S.D.N.Y. 2005); *see also Henry Avocado Corp. v. Z.J.D. Brother, LLC*, No. 17-CV-4559 (ARR)(RLM), 2019 WL 1586865, at *11 n.10 (E.D.N.Y. Apr. 12, 2019) ("Defendants argue that the fact that the invoices are not signed by any individuals who work for [plaintiff] renders them invalid as confirmatory agreements.  However, a physical signature is not necessary for a document to be 'sufficient against the sender.'  To the contrary, electronic signatures, stamps, and other forms of authentication satisfy the merchants exception to the statute of frauds.") (internal citations omitted); *Antifun Ltd. T/A Premium Vape v. Wayne Indus. LLC*, 616 F. Supp. 3d 291, 308 (S.D.N.Y. 2022) ("Electronic communications between merchants—provided that they are sufficiently precise—can also serve as writings confirming an agreement."); *Norminjil Sportswear Corp. v. T G & Y Stores Co.*, 644 F.

---

[3] Subsection 37 has since been amended to read:

"Sign" means, with present intent to authenticate or adopt a record:
(A) execute or adopt a tangible symbol; or
(B) attach to or logically associate with the record an electronic symbol, sound, or process.
"Signed, "signing", and "signature" have corresponding meanings.

N.Y. U.C.C. § 1-201(37) (effective June 3, 2026).  The new standard is, if anything, more permissive towards AriZona and so would not alter the analysis here.

14

Supp. 1, 4 (S.D.N.Y. 1985) ("The question before us is whether a reasonable merchant, seeing the memorandum in question would understand it to be a confirmation of consummated oral agreement.").

Yet, courts have still spent many years perseverating over the distinction between a "typed" email signature and signature blocks generated automatically. *See e.g. Garcia v. Dezba Asset Recovery, Inc.*, 665 F. Supp. 3d 390, 403 n.2 (S.D.N.Y. 2023) (collecting cases). That debate stems from the New York Court of Appeals' decision in *Parma Tile Mosaic & Marble Co. v. Estate of Short*, 87 N.Y.2d 524 (1996), which held that pre-programmed imprinting on fax transmissions of the sender's contact information did not sufficiently authenticate those documents for statute of frauds purposes.

Nevertheless, as email increasingly replaces paper transactions as the dominant mode of business communication, courts including the Appellate Division directly bound by the Court of Appeals have determined that the "distinction between prepopulated and retyped signatures in emails reflects a needless formality that does not reflect how law is commonly practiced today" because "[i]t is not the signoff that indicates whether the parties intended" to contract via email, "but rather the fact that the email was sent." *Philadelphia Ins. Indem. Co. v. Kendall*, 151 N.Y.S.3d 392, 396 (1st Dep't 2021) (explaining in the settlement agreement context, "if an attorney hits 'send' with the intent of relaying a settlement offer or acceptance, and their email account is identified in some way as their own, then it is unnecessary for them to type their own signature. This rule avoids unnecessary delay caused by burden-shifting swearing

15

contests over whether an individual typed their name or it was generated automatically by their email account.") (internal quotation marks omitted).

The Court agrees with Judge Oetken's view that "[a]lthough it appears that neither the First Department nor any other New York appellate court has extended *Philadelphia* to the Statute-of-Frauds context, the Court can discern no reason why the result should differ." *Lehrman v. Lovo, Inc.*, 790 F. Supp. 3d 348, 361 n.3 (S.D.N.Y. 2025). As a result, where email "messages were sent from accounts that are identified with persons we now know to be agents of" a corporate party, the corporate party is "bound by those messages," absent conflicting authority from the New York Court of Appeals or Second Circuit. *Id.* at 361.

This reading comports with the U.C.C.'s pragmatic orientation, which instructs that the statute "must be liberally construed and applied to promote its underlying purposes and policies," including "to simplify, clarify, and modernize the law governing commercial transactions." N.Y. U.C.C. § 1-103; *see also Dell's Maraschino Cherries Co. v. Shoreline Fruit Growers, Inc.*, 887 F. Supp. 2d 459, 471 (E.D.N.Y. 2012) ("practical business people cannot be expected to govern their actions with reference to nice legal formalisms. Thus, when there is basic agreement, however manifested and whether or not the precise moment of agreement may be determined, failure to articulate that agreement in the precise language of a lawyer, with every difficulty and contingency considered and resolved, will not prevent formation of a contract.") (quoting *Kleinschmidt Div. of SCM Corp. v. Futuronics Corp.*, 41 N.Y.2d 972, 973 (1977)). There may of course be circumstances where sending an email does not objectively

16

indicate adoption of the email's contents.  But here, the objective indicia of the October 18th email suggest that Mr. Menashi meant to authenticate the contents of the email by sending it.  The email references the alleged oral agreement and makes specific representations about discrete terms in the putative contract.[4]  Under the circumstances, Mr. Menashi evidenced a contemporaneous intent to authenticate the contents of the email for purposes of the statute of frauds by sending it to Mr. Sladewski.

Ardagh also argues that there is no quantity term in the agreement, and so AriZona cannot prove existence of a contract even under the U.C.C.'s lenient standard. However, the October 18th email references a projected range of 200 to 325 million units per year.  DE 50, Ex. C.  As AriZona recounts, the Second Circuit has recognized that a quantity range can represent a sufficiently definite quantity in certain circumstances. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 749 (2d Cir. 1998) (applying identical Connecticut provision and finding that "description of quantity in terms of a range satisfies the Statute of Frauds").  Furthermore, to the extent that the "no take or pay" provision disclaims a minimum, the evidence is also plausibly consistent with a regional requirements contract, given Mr. Sladewski's emailed reference to the contract covering "100% of [AriZona's] SE requirements."  DE 50, Ex. B.

---

[4] Ardagh cites a January 20, 2025 email from Mr. Sladewski to Mr. Menashi which includes a statement that "we are operating without a formal supply agreement" as evidence that the parties never entered into a contract.  Mot. at 13–14 (citing DE 11, Ex. A).  In context, that quotation could plausibly refer to the quantity of cans to be supplied varying depending on the month.  Therefore, reconciliation of that email with the alleged contract is more appropriate after discovery concludes.

17

In such circumstances, the U.C.C. may imply a best-efforts clause into the contract, which would establish a minimum volume.

In any event, the precise meaning of any ambiguous terms are issues of fact that are inappropriate to adjudicate on a 12(c) motion and indeed could be inappropriate to adjudicate at summary judgment. *See Consarc Corp. v. Marine Midland Bank, N. A.*, 996 F.2d 568, 577 (2d Cir. 1993) ("Summary judgment is improper where "there exist genuine issues of material fact with respect to whether the parties reached an oral agreement"); *Adler v. Payward, Inc.*, No. 18-CV-8100 (RMB), 2024 WL 1138941, at *3 (S.D.N.Y. Mar. 14, 2024) ("where, as here, a plaintiff raises issues of fact as to whether the parties entered into an actual contract and as to the specific terms incorporated into such contract, summary judgment should be denied.") (quoting *Tokio Marine & Fire Ins. Co. v. Fed. Marine Terminal, Inc.*, 397 F. Supp. 2d 530, 535 (S.D.N.Y. 2005)) (cleaned up).[5]

---

[5] Whether the October 18th email reflects a minimum quantity is, in the universe of this litigation, an issue of existential importance that could materially affect both liability and damages. Accordingly, the parties are directed to work with Magistrate Judge Lindsay to prioritize discovery of materials and testimony bearing on that issue. *See Bonchon LLC v. LKRG Provisions & Holdings, LLC*, No. 20-CV-3938 (DLC), 2021 WL 5042858, at *4 (S.D.N.Y. Oct. 29, 2021) (granting summary judgment where "the Supply Agreement omits the quantity of the [products] to be purchased by [plaintiff]" because "[w]hile it lists the 'Estimated Volume' . . . the Agreement explicitly describes that volume as an estimate rather than a commitment by [defendant] to produce that volume or by [plaintiff] to purchase that volume."); *cf. Nora Beverages*, 164 F.3d at 749 ("The commentary to the U.C.C. [§ 2–201] indicates that quantity 'need not be accurately stated but recovery is limited to the amount stated.' This language suggests that description of quantity in terms of a range satisfies the Statute of Frauds but that the plaintiff may be limited in its recovery to the lower end of the range.") (construing Conn. Gen. Stat. Ann. § 42a–2–201, which is identical to New York U.C.C. § 2–201); *see also INEOS Americas LLC v. Dow Chem. Co.*, 378 F. App'x 74, 80 (2d Cir. 2010) (affirming district court's award of only nominal damages for breach of a requirements contract).

Accordingly, the October 18th email from Mr. Menashi would be "sufficient against" AriZona and satisfies the statute of frauds.[6]

However, that is not the end of the analysis, for the confirmatory memorandum exception "does not eliminate the requirement of mutual assent to a contract." *Spinnerin Yarn Co. v. Apparel Retail Corp.*, 614 F. Supp. 1174, 1179 (S.D.N.Y. 1985). Otherwise, a plaintiff would be able to "rely on a transmitted confirmation of a contract that never existed and then hold [the] defendant to the non-existent contract because [the] defendant failed to object." *Id*. Thus, AriZona still must plausibly allege the existence of a contract to survive the 12(c) motion.

## II.    Existence of Contract

Ardagh argues that AriZona has not provided sufficient evidence of an agreement between the parties. Under the U.C.C., while the ultimate question of contract formation is one of law, foundational issues including intent are issues of fact where disputed evidence must be considered alongside a writing.[7] *Mallad Const. Corp.*

---

[6] Any remaining issues related to the statute of frauds would be premature to consider at this stage. *See e.g.*, *E. Mishan & Sons, Inc*, 2012 WL 2952901, at *5 ("the issue of what form of response constitutes an objection is a question of fact dependent on trade usage."); *Bazak Int'l Corp.*, 378 F. Supp. 2d at 387 ("[w]hether receipt of a confirmatory writing has occurred is a question of fact, inappropriately determined on summary judgment.").

[7] Ardagh cites *Vacold LLC v. Cerami* for the proposition that "[u]nder New York law, whether a binding agreement exists is a legal issue, not a factual one." 545 F.3d 114, 123 (2d Cir. 2008). That principle only applies where the existence of the contract is not disputed or where the evidentiary record consists solely of writings. *Id.* Indeed, as *Vacold* itself explained: "so long as the evidence does not point unerringly in a single direction but is capable of supporting conflicting inferences, the question of whether a contract has been formed . . . is a question of fact." *Id.*

19

*v. Cnty. Fed. Sav. & Loan Ass'n*, 32 N.Y.2d 285, 291 (1973) ("where the intent must be determined by disputed evidence or inferences outside the written words of the instrument [ ] a question of fact [is] presented"); *see also U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 145 (2d Cir. 2001) ("[t]he determination of whether there was a meeting of the minds sufficient to constitute a contract is one of fact.") (citing *Interocean Shipping Co. v. National Shipping & Trading Corp.*, 523 F.2d 527, 534 (2d Cir. 1975)).

Questions surrounding formation of disputed contracts are therefore frequently within the province of the trier of fact. *See e.g., Nora Beverages*, 164 F.3d at 748 (denying summary judgment on claim asserted under identical provision of Connecticut's U.C.C. because "there are issues of fact as to whether [the parties] arrived at a contract"); *Jamuna Fashion Wears Ltd. v. Micom Trading Corp.*, No. 09-CV-5339 (BSJ)(MHD), 2012 WL 13140780, at *5 (S.D.N.Y. Dec. 28, 2012) (explaining in U.C.C. case that "'[w]hen the language of a contract is ambiguous and there is relevant extrinsic evidence regarding the actual intent of the parties, an issue of fact is presented' for the fact finder to resolve.") (quoting *Scholastic, Inc. v. Harris*, 259 F.3d 73, 83 (2d. Cir. 2001)); *see also DiLorenzo v. Est. Motors, Inc.*, 802 N.Y.S.2d 516, 517 (2d. Dep't 2005) ("there is an issue of fact as to whether the parties intended to conclude the contract despite the fact that the sales price was not settled") (citing U.C.C.); *Marquette Co. v. Norcem, Inc.*, 494 N.Y.S.2d 511, 513 (1985) ("this question of the real intent of the parties is a question properly . . . addressed by the trier of fact."); *Diversified Prods., Inc. v. Tops Markets, Inc.*, No. 99-CV-0457 (EF), 2001 WL 640697, at *4 (W.D.N.Y. June 7, 2001) ("The U.C.C. [ ] allows parties

to enter into a contract for the sale of goods even though the sales price is not yet settled, if the parties intend to do so and whether the parties intended to conclude a sales contract before settling on a price is usually an issue of fact to be decided by the jury.").

Thus, simply stated, "[w]hen determining whether the parties intended to be bound, it is the responsibility of the Court to interpret written instruments, while other evidence about intent, from which differing inferences can be drawn, is left for the trier of fact." *Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.*, 578 F. Supp. 3d 467, 497 (S.D.N.Y. 2022) (cleaned up).

And formation is particularly a question of fact where an oral agreement is alleged. *Spa World Corp. v. Lipschik*, No. 09-CV-1711 (TCP), 2010 WL 11632681, at *6 n.3 (E.D.N.Y. Sept. 9, 2010) ("Pursuant to New York law, whether or not an oral contract exists is typically a question for the trier-of-fact.") (citing *McCallum v. Pickens*, 213 N.Y.S. 119, 121 (N.Y. Sup. Ct. 1925)); *Henry Avocado Corp.*, 2019 WL 1586865, at *9 (denying motion to dismiss where plaintiff's "version of the oral agreements between the parties [wa]s specific and grounded in evidence."); *Whitemarsh Indus., Inc. v. Sears Roebuck & Co.*, 595 N.Y.S.2d 763, 764 (1st Dep't 1993) ("the issues surrounding the alleged oral agreement, the confirmatory writing, and the objection thereto present factual issues inappropriate for summary resolution") (citing *Mast Indus., Inc.*, 73 N.Y.2d at 123).

The U.C.C. is substantially more permissive than the common law when it comes to proving the existence of a contract. Under the U.C.C., "a contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by

both parties which recognizes the existence of such a contract." *City Calibration Centers Inc. v. Heath Consultants Inc.*, 727 F. Supp. 3d 332, 356 (E.D.N.Y. 2024). And while a contract for the sale of goods presumptively must include quantity, price, and manner of delivery terms, "under the N.Y. U.C.C., if the parties have intended to contract, and if an appropriate remedy may be fashioned, a contract for sale does not fail for indefiniteness if terms, even important terms, are left open." *Antifun Ltd.*, 616 F. Supp. 3d at 306. Therefore, even where the parties to a contract fail to specify either a time, price, and/or manner-of-delivery term, a contract is not necessarily unenforceable since "the U.C.C.'s 'gap filling' provisions supply 'a reasonable time' for shipment or delivery; 'a reasonable price at the time of delivery;' and 'the seller's place of business … [,] [the seller's] residence' or any other location of the goods known by the parties" for the manner-of-delivery." *City Calibration Centers*, 727 F. Supp. 3d at 356. The quantity term can also be gap-filled by a best-efforts obligation in an exclusive or requirements contract. *See* N.Y. U.C.C. § 2–306; *Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.*, No. 22-2317, 2025 WL 3257058, at *2 (2d Cir. Nov. 21, 2025) ("section 2-306(2) of the N.Y. U.C.C. supplied the contract's missing 'quantity' term").

Here, AriZona alleges Mr. Sladewski and Mr. Menashi reached an oral agreement, which Mr. Menashi then purportedly memorialized in the October 18th email. Because that email explicitly references an earlier conversation and because the Complaint plausibly alleges that the parties subsequently performed in conformance with the agreement, as memorialized in the email, the Court finds that AriZona plausibly alleges that the parties reached an oral argument. *See City Calibration Centers*,

22

727 F. Supp. 3d at 358 (finding breach of contract claim plausible, in part because "the allegations in the [complaint] that the parties performed under the 2021 Agreement for a year . . . lends further credence to [defendant]'s intent to be bound.").

That conclusion is buttressed by the fact that the parties discussed pricing adjustments which, according to the Complaint, would not have made sense in the context of an agreement running less than a year.  Furthermore, the Complaint plausibly alleges that at least one Ardagh representative discussed pricing adjustments in conformance with the alleged agreement even after Mr. Sladewski had repudiated and claimed that no contract existed.  And the Complaint states that Ardagh provided AriZona with 112 million cans in exchange for over $15 million, amounts which plausibly establish that the parties were operating in conformance with the alleged supply agreement.

While Ardagh contends that the October 18th email lacks essential terms, the U.C.C. could supply all but one of those terms through gap-fillers, even assuming that those terms were not expressed with sufficient clarity.  As noted, the quantity term can plausibly be established by the projected range provided in the October 18th email or, alternatively, through an implied best-efforts clause if the alleged agreement were to be deemed a requirements contract.  Given the subsequent performance by both parties and the specificity of the agreement expressed in the October 18th email, the Court finds the existence of an agreement to be plausible.

23

### III.    Promissory Estoppel and Implied Covenant of Good Faith

Ardagh also argues that AriZona's claims for promissory estoppel and breach of the implied covenant of good faith and fair dealing should be dismissed.

As for the covenant of good faith, Ardagh's motion assumes that the breach of contract claim was dismissed for failure to comply with the statute of frauds.  *See* Mot. at 20.  Because the Court denies the motion as to the breach of contract claim, Ardagh's argument is, at best, premature.  Therefore, the motion is denied as to the breach of the covenant of good faith claim.

However, the motion is granted as to the promissory estoppel claim.  "Under New York law, a claim for promissory estoppel requires a clear and unambiguous promise, reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained in reliance on that promise."  *Steinbeck v. Steinbeck Heritage Found.*, 400 F. App'x 572, 577 (2d Cir. 2010) (cleaned up).  The emails between the parties do not establish any clear and unambiguous promises, and AriZona does not argue otherwise.  *See* Opp. at 19–20.  AriZona therefore waived the argument, and the claim is appropriately treated as abandoned.  *See Malik v. City of New York*, 841 F. App'x 281, 284 (2d Cir. 2021) ("a court may infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."); *see also Maroney v. Woodstream Corp.*, 695 F. Supp. 3d 448, 468 (S.D.N.Y. 2023) ("In the Second Circuit, a plaintiff's failure to respond to contentions raised in a motion to dismiss constitutes an abandonment of those claims and necessitates their dismissal.") (cleaned up).

The Court therefore grants the motion for judgment on the pleadings as to the promissory estoppel claim, but not as to the breach of the implied covenant of good faith.

**Conclusion**

Accordingly, the Court grants Ardagh's motion for judgment on the pleadings as to AriZona's promissory estoppel claim.  The motion is otherwise denied.

**SO ORDERED.**

Dated: July 22, 2026
      Central Islip, New York

*/s/ Gary R. Brown*
GARY R. BROWN
United States District Judge

25